Filed 6/16/14  P. v. Fleming CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>TRAVIS ALEXANDER FLEMING,<br><br>    Defendant and Appellant. | F064115<br><br>(Super. Ct. No. F10904285)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  James M. Petrucelli, Judge.

Timothy E. Warriner, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Kari Ricci Mueller, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury convicted appellant Travis Alexander Fleming of one count of child abuse (Pen. Code, § 273a, subd. (a))[1] with the allegation that he personally inflicted great bodily injury on the victim (§ 12022.7, subd. (d)). The trial court sentenced Fleming to an aggregate term of 11 years in state prison.

On appeal, Fleming contends (1) the prosecutor's remarks about Fleming's demeanor at trial constituted *Griffin*[2] error and violated his Fifth Amendment due process rights; (2) the prosecutor committed misconduct during closing argument; (3) a mistrial was warranted based on a prospective juror's comments during jury selection; (4) the trial court abused its discretion when it admitted evidence of Fleming's military experience; (5) trial counsel was ineffective for failing to subpoena an expert witness; and (6) the trial court abused its discretion when it denied Fleming's posttrial *Marsden*[3] motion. We affirm the judgment.

## FACTUAL AND PROCEDURAL SUMMARY

### Prosecution Evidence

Fleming and K.S. (mother) have a baby boy, B., born in January 2010.[4] Sometime in January, prior to B.'s birth, Fleming was upset and punched a hole in the bedroom door. Mother could not remember what triggered that behavior, although she admitted she and Fleming often raised their voices, argued, and shouted at each other. She never saw Fleming hit, shake, or inappropriately touch B. to calm him down, and she claimed Fleming never abused her or B.

On February 14, Valentine's Day, Fleming gave mother a letter which read, in part, "You have changed me so much since I met you that even my parents have seen it

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

[2] *Griffin v. California* (1965) 380 U.S. 609 (*Griffin*).

[3] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

[4] All further dates are to the year 2010 unless otherwise stated.

and hold you responsible. And thats [*sic*] why as soon as I can go see a doctor, I will get the extra help I need to give you the greatest gift I could ever give you. The real me!" At trial, mother explained that Fleming planned to see a therapist because he had "a problem with trusting."

Mother's sister, Kellie, who lived in an apartment downstairs, came over for breakfast on the morning of February 14 and watched a movie and played with B. Neither mother nor Kellie noticed any unusual or lethargic behavior on B.'s part, and his energy seemed normal.

In the early afternoon after Kellie left, mother and Fleming took B. for a walk to a nearby gas station to buy some rum and Coke. When they returned home, mother fed B. and put him down for a nap. She and Fleming went outside for a drink on the patio; their neighbor James Bartram was outside and they talked to him.

Approximately 45 minutes later, B. woke up crying and Fleming went into the bedroom to change the baby's diaper. Mother did not hear Fleming make any aggressive or angry comments while he was gone.

About 10 to 15 minutes later, Fleming went back inside to check on B. because he and mother had not heard any noises on the baby monitor. Fleming called for mother, and she saw that Fleming had moved B. onto the bed and was clapping B.'s feet together and touching his face because he was not breathing. Fleming took B. into the living room, placed him on the floor and began CPR; mother called 911. Kellie arrived and Fleming told her that B. threw up, choked and stopped breathing.

An emergency medical technician (EMT) who responded to the call determined B. was having difficulty breathing. The EMT performed a "head-tilt chin lift" to open the airway and used a "bag valve mask" to get oxygen into B.'s lungs. The EMT observed that B. appeared generally healthy aside from a fresh "little" bruise on his left cheek. No other signs of injury were noted on B.'s arms, chest, or head. B. was transported by ambulance to the regional medical center.

Emergency medical resident Dr. Fernando Macias treated B. in the emergency room. He found no fractures but observed a bruise on B.'s left cheek. A CT scan revealed evidence of blood in and around B.'s brain. B. was transferred to Valley Children's Hospital (VCH).

Dr. Gary Magram, a pediatric neurosurgeon, saw B. while he was at VCH. According to Magram, the CT image of February 14 revealed blood on the top left portion of B.'s head, a bruise on the bottom right side of the brain, and an area of abnormality on the left frontal lobe. Magram noted no skull fracture and surgery was not required.

Dr. John Kinnison, a pediatric hospitalist, was brought in on B.'s case while B. was at VCH. Due to the presence of blood in the first CT scan, B. was referred for a followup MRI. The CT and MRI showed three significant findings: encephalomalacic/leukomalacic changes on both sides of the lower frontal lobe, subdural effusions between the skull and the brain, and subarachnoid hemorrhaging between the skull and the brain. Kinnison found the results peculiar because encephalomalacic/leukomalacic changes are not typical of an acute presentation. But the subarachnoid hemorrhages appeared acute in nature, and the subdural effusions may or may not have been acute as they appeared to be in the process of resolution.

Because of these results, Kinnison referred B. to an infectious disease specialist and a genetic specialist for a complete medical workup. Doctors ruled out meningitis. They discovered cytomegalovirus in B.'s urine and blood, but not in his spinal fluid, although that was determined not to be the cause of the encephalomalacia and leukomalacia. Although Dr. Curry, a genetic specialist, found markers present for thrombophilia (which manifests in patients as a stroke), she did not believe this provided an explanation for either the subarachnoid hemorrhages, encephalomalacia, or leukomalacia reflected on the imaging scans. Glutaric aciduria, a metabolic disorder,

4.

also was ruled out. An ophthalmologist found evidence of retinal hemorrhages in B.'s left eye.

Kinnison reviewed B.'s birth history but found nothing to explain his injuries. Following the complete medical workup, Kinnison concluded, with a "reasonable degree of medical certainty," that B.'s injuries were caused by nonaccidental trauma.

Kinnison explained that shaking a baby's head could cause bleeding to the brain due to the sheering of veins. B.'s MRI showed bleeding in both the subarachnoid space and subdural space. Sheering of veins was indicated by the subdural effusions, which were suggestive of older blood or possibly subacute bleeding, as well as the subarachnoid bleeding. In addition, the encephalomalacia and leukomalacia also were suggestive of sheering injuries.

Based on B.'s injuries, Kinnison opined B. had suffered two instances of injury. He noted there was evidence of acute subarachnoid bleeding, which meant the injury occurred sometime close to the time B. was admitted to the hospital. He opined the acute injury was caused by a nonaccidental head trauma, either due to a contact injury or a noncontact injury.

The encephalomalacic/leukomalacic areas were not suggestive of an acute injury because there was no swelling. As such, Kinnison opined the injury occurred in a short timeframe prior to B.'s admission to the hospital, possibly caused by an acceleration/deceleration injury. Kinnison concluded the encephalomalacic/leukomalacic findings were not consistent with birth trauma, nor were they caused by the administration of CPR.

Dr. Graciela Esquivel-Aguilar, B.'s primary pediatrician, testified that B.'s normal vaginal delivery resulted in a small hematoma on the back of his head. B.'s postbirth exam was normal and he was described as a healthy baby. At his two-week checkup, B. was normal except that his weight gain was slow. Fleming and mother reported B. had been crying a lot the day before, but Esquivel-Aguilar found no specific cause for his

irritability.  Esquivel-Aguilar determined that the tiny spots on B.'s left cheek were Mongolian spots.  Due to his slow weight gain, Esquivel-Aguilar asked that B. return for a followup appointment two days later.  Instead, Fleming and mother brought him back four days later.  That was the last time Esquivel-Aguilar saw B. prior to the February 14 incident.

Detective Michael Cross, the primary investigating officer, interviewed Fleming and mother on February 17.  Mother described her pregnancy and delivery with B. as normal and without complications.  Fleming told Cross he had been kicked out of Army boot camp because the drill sergeants did not like him.  Fleming also claimed he and mother "fought like a normal couple" and were "both equally aggressive."  Fleming did admit he punched a hole in the bedroom door after a fight with mother a month prior.

When asked about the Valentine letter he had written, Fleming explained mother thought he had an anger problem and needed counseling.  Fleming admitted he would become angry and "fly off the handle," but he would take a walk, lift weights, kick things, and punch things to alleviate his anger.

When Cross asked Fleming about B.'s general behavior and temperament, Fleming said that B. "cries like ballistic."  On February 13 B. stayed awake and cried for approximately three hours.  Fleming insisted that on February 14 he and mother consumed only two shots of alcohol during the afternoon.  When Cross asked why the alcohol bottle was empty, Fleming claimed the bottle was cold from the freezer and it slipped out of his hand and accidentally spilled.

According to Fleming, he and mother had been "hanging out" during the afternoon when B. woke up crying about 4:00 p.m.  Fleming went into the bedroom to change B.'s diaper before returning to the living room.  Sometime later, he realized that there were no sounds coming from B.'s baby monitor, so he went to check on him.  B. was nonresponsive, so Fleming yelled for mother to call 911.  Fleming tried to revive B. by clapping B.'s feet together and patting his face.  He then began to perform CPR.

6.

Fleming reenacted the event for Cross using a doll. As he exited the bedroom carrying the doll in his right arm, Fleming bumped his right shoulder into the doorjamb. Fleming stopped the reenactment and appeared to start to cry, but Cross saw no tears. Fleming then took several deep breaths and said something to the effect, "I did it, I did do it." Fleming explained to Cross that he thought he must have hurt B. when he jarred his shoulder into the doorjamb as he moved B. into the living room. But Fleming maintained he never hit B.

Kellie told Cross she thought Fleming had been involved with the Army Special Forces for approximately six years. In the weeks following the incident with B., Kellie noticed Fleming and mother fighting with each other more frequently. She saw a bruise on mother's arm, which she reported to Cross. Kellie testified she did not believe Fleming intentionally hurt B., and that she never saw him physically abuse, shake, or hit B. or mother.

Two witnesses testified regarding prior instances of domestic violence with Fleming. Leanna B. met Fleming in November of 2005, and they dated for a couple of years. They had a son together in late 2006. When their son was approximately six months old, Leanna and Fleming got into an argument while out to dinner and it continued on the way home. While Leanna was driving through a parking lot, Fleming exited the moving vehicle and attempted to take their son from the car. When Leanna refused to stop, Fleming became even angrier. He got back into the car and punched Leanna four or five times in the head, causing her to bleed. Leanna reported the incident to law enforcement the following day.

Leanna also testified that when their son was two months old, she left him in Fleming's care while she went to work. When she returned home, she noticed their son had a bruise over his left eye. Fleming denied hurting the child and claimed the injury occurred while he was in the care of Leanna's aunt. Leanna did not report the injury or

7.

have it treated by a doctor because Fleming told her the doctor would accuse her of abusing their son.

Patricia L. testified she had a relationship with Fleming in 2006. In August of that year, she and Fleming got into an argument and Fleming followed Patricia through the apartment and refused to let her leave. Fleming blocked the doors and removed the battery from Patricia's cell phone. When Patricia attempted to use Fleming's cell phone, he grabbed her wrist and threw her onto a mattress. When Fleming eventually calmed down, Patricia left the house and called the police. While they were dating, Fleming, who always wore cargo pants and dog tags, told Patricia he had been in the Army and had killed several people. Fleming subsequently was arrested for making threats toward Patricia. Patricia acknowledged Fleming never hit or kicked her.

### *Defense Evidence*

Mother testified for the defense that she always placed B. on his back when he slept. She also reaffirmed her earlier testimony regarding the events of February 14, including her claim that she consumed only one alcoholic drink that afternoon.

Sandra Cornell met Fleming in the middle of 2009 when he and mother lived with her for approximately six months. She described Fleming and mother as having "normal everyday problems" and disagreements, but she never saw Fleming physically assault mother. Cornell believed Fleming and mother were happy and attentive parents to B. She never saw Fleming act violently toward B. On one occasion, Fleming came over to see her and he was "a little like stressed" because B. was having a "temper tantrum" and had been up all night. Cornell described Fleming as having "a little bit of a temper" "like most people." Although she claimed he never exhibited violence toward her, he did have a heated argument with Cornell's husband and "put his hands" on him. Cornell heard Fleming had been in the Army and had prior instances of domestic violence, but she claimed not to know specifics.

8.

Bartram, Fleming and mother's neighbor, saw Fleming and mother several times on February 14. Fleming appeared to be in a good mood all day, and Bartram did not notice any unusual behavior until he heard mother call 911. Bartram was impeached with felony domestic violence and driving under the influence convictions.

Dr. David Posey, a board-certified anatomic and clinical pathologist, testified as a medical expert. Posey reviewed B.'s medical records, consulted with Dr. Patrick Barnes, a neuroradiologist, and Dr. Atkinson, a neuropathologist. Posey testified the records revealed no evidence of external trauma. He described the discoloration under B.'s left eye, stating, "it could be a small birth mark," but "not a bruise." He agreed B. had retinal hemorrhaging in his left eye, but it was not an "overly great amount of hemorrhage." Posey explained that victims of intentional abusive trauma typically suffer hemorrhaging in both eyes. Posey did not believe B.'s injuries were consistent with shaking because there were no bone fractures, neck or spinal injuries, or bruising to the arms, shoulders or ribs.

Posey did agree that the subarachnoid hemorrhage was indicative of an acute finding. He also agreed that the record and studies suggested an older finding, which he opined occurred either right before or during birth and was likely a "hypoxic injury." Posey and Barnes disagreed with the prosecution's experts' exclusions of thrombosis as the cause of the injuries. Posey theorized the acute injuries could have resulted from B. being placed on his back in the crib and choking on his gastric contents while he slept. He agreed the injuries were not caused by the administration of CPR.

Based on his review of the records and consultation with Barnes and Atkinson, Posey opined that B., sometime at or about the time of birth, suffered a hypoxic episode in which his brain was deprived of oxygen. According to Posey, it was during this episode that B. sustained an undiagnosed subdural injury, which was still in the process of healing on February 14. Then, on February 14, B. either experienced an apneic episode, in which he stopped breathing while sleeping, or he spit up in his sleep and

9.

stopped breathing for a few minutes, which caused the acute finding in the subarachnoid and aggravated the older subdural injury. This also caused B.'s brain to swell, which caused the retinal hemorrhaging.

Posey and his colleagues disagreed with Kinnison's conclusion that the case involved nonaccidental inflicted trauma. Had that occurred, Posey would have expected other external evidence of physical injury, such as fractures or neck injuries.

### *Rebuttal Evidence*

The People recalled Kinnison, who disagreed with Posey's assessment that the injuries resulted from a hypoxic event at B.'s birth because the location of the encephalomalacic/leukolmalacic areas were not consistent with where he would expect to see them in a hypoxic event. In addition, Kinnison and the neuroradiologist concluded that the injuries resulted from true trauma, as opposed to a birth-related event, based on the sheering injury, the healing that had occurred, and some hemorrhagic appearance. Curry, the genetic specialist, agreed with Kinnison in ruling out thrombophilia, based on her review of the birth records and medical workup done on B.

Kinnison also disagreed with Barnes's opinion that shaking alone, without impact, was insufficient to cause B.'s injuries, absent some other evidence of external injury. According to Kinnison, his diagnosis that B. suffered a nonaccidental injury was based on the results of his complete medical workup and review and interpretation of the films, X-rays, and scans. He looked for every possible medical explanation or cause of the injuries before reaching his conclusion.

## DISCUSSION

## I.    Prosecutor's Comments During Closing Argument

Fleming contends that the prosecutor's comments during closing argument on his demeanor at trial constituted *Griffin* error and violated his Fifth Amendment due process right to be convicted of evidence adduced only at trial. Fleming argues further that the trial court erred in overruling his objection and then abused its discretion when it denied

10.

his motion for a new trial based on this incident by applying the incorrect legal standard to the federal constitutional error.  Fleming asks this court to order a new trial, or, in the alternative, to remand the matter to the trial court for reconsideration of the motion for new trial using the correct legal standard.

### *Procedural Summary*

During closing argument, defense counsel addressed Fleming's purported past instances of violence and argued such testimony was not evidence of Fleming's guilt. Defense counsel then stated that Bartram's testimony was important because he saw mother and Fleming three times on the afternoon of February 14 and "[a]t no point does he see any signs that [Fleming] is losing control.  At no point does he see any signs that [B.] is being particularly fussy."  In other words, refuting the prosecution's portrayal of Fleming in earlier closing argument as so angry and frustrated with B. that he lost control and shook him.

During rebuttal, the prosecutor noted this was a case of circumstantial evidence. He again addressed the various doctors and their diagnoses and one of the women who had testified to Fleming's prior acts of violence.  Then he said the following:

> "Now, there's also portrayal, I guess, that was the purpose of Mr. Bartram's testimony to say, you know, [Fleming] didn't show any signs of being upset on that particular day, no emotion, no anger, nothing.  You've had an opportunity to observe [Fleming] during the testimony in the courtroom. Have you seen him crying?  Have you seen him angry?  Have you seen him emotionally distraught?"

Defense counsel objected, stating the prosecution's argument was "bordering on *Griffin* error."  The trial court noted the objection and held an unreported sidebar discussion. Following the sidebar, without a ruling or an admonishment on the record, the prosecutor continued with rebuttal.

Following trial, Fleming made a new trial motion based, in part, on prosecutorial misconduct as evidenced by the above referenced statements made in rebuttal.[5]  At the hearing on the motion, defense counsel argued the prosecutor's comments on Fleming's nontestimonial behavior "violate[d] his due process rights and his Fifth Amendment right not to testify."  As asserted by defense counsel, the prosecutor was asking the jury to conclude that since Fleming was not angry on February 14, and he did not appear to be angry during the trial, in essence, Bartram's testimony was not valid or not worthy of consideration.  He contended the comment was "asking the jurors to use Mr. Fleming's non-testimonial behavior as substantive evidence of his guilt .…"  Defense counsel claimed the statements were inappropriate, and that under either *Chapman*[6] or *Watson*[7] reversal was required.

The prosecutor argued the comments "[c]learly" were "not *Griffin* error," as they in no way commented on Fleming's lack of testimony.  The prosecutor also maintained it was the defense that put this issue in front of the jury by having witnesses state Fleming was "not angry in any way" on February 14, and therefore it was appropriate for the People "to point out to the jury that during this trial when there was some emotional testimony that was presented, there was no expression likewise that was presented by Mr. Fleming."

After considering arguments of counsel, the trial court observed that in federal cases, if prosecutorial misconduct is of constitutional dimension, the error is reversible if not harmless beyond a reasonable doubt.  If it is not of constitutional magnitude, it is

---

[5]     Attached to the motion was a declaration from defense counsel stating that, at the sidebar after the objection at trial, the trial court, inter alia, overruled the *Griffin* objection, stating that defense counsel's theory was "way off."

[6]     *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).

[7]     *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).

reversible only if it is reasonably probable that a more favorable result would have occurred if the prosecutor had refrained from the misconduct. The trial court also noted that "[s]tate cases that discuss improper conduct in the form of comments regarding the defendant's demeanor do not suggest that this misconduct violates any constitutional right" and apply a reasonable probability standard.

The trial court stated, "The bottom line is that the prosecutor should not have asked the jury to consider the defendant's demeanor in court. It is unclear to me if in doing so the prosecutor was asking the jury to draw any adverse inference of guilt from the defendant's conduct. In any event, his comments, I believe were inappropriate." The trial court stated that while it believed the jury was correctly instructed, "it would have been better if I had sustained the objection and admonished the jury at the time the comment was made." The trial court stated it did not believe it had judicially endorsed the prosecutor's actions. The trial court concluded that "in light of the entire record," there was no reasonable probability that, absent the prosecutor's comment, the jury would have found Fleming not guilty.

### *Griffin Error*

Fleming contends the comments about his demeanor violated the *Griffin* rule. We note the trial court never mentioned *Griffin* during the hearing on the new trial motion. We therefore must determine whether the alleged misconduct constitutes *Griffin* error in the first instance. We conclude it does not.

The doctrine of *Griffin* error bars the prosecutor from suggesting that the jury should draw an inference adverse to the defendant because he or she did not testify at trial, in legitimate reliance on his or her Fifth Amendment privilege against self-incrimination. (*Griffin, supra,* 380 U.S. at p. 615.) *Griffin* error occurs when there is a reasonable likelihood jurors could have understood the prosecutor's comments, in their context, to refer to the defendant's failure to testify as evidence of guilt. (*People v. Clair* (1992) 2 Cal.4th 629, 663.) The California Supreme Court extended this principle in

13.

*People v. Vargas* (1973) 9 Cal.3d 470 (*Vargas*) by holding improper a prosecutor's comment on the absence of evidence that could be provided only by the defendant's testimony. (*Id.* at pp. 475-476.)

But *Griffin* does not preclude a prosecutor from commenting on the state of the evidence or the defendant's failure to call logical witnesses or introduce material evidence. (*Vargas, supra,* 9 Cal.3d at p. 475.) Additionally, "a prosecutor is justified in making comments in rebuttal, perhaps otherwise improper, which are fairly responsive to argument of defense counsel and are based on the record." (*People v. Hill* (1967) 66 Cal.2d 536, 560.) Also, "'brief and mild references to a defendant's failure to testify, without any suggestion that an inference of guilt be drawn therefrom, are uniformly held to constitute harmless error.' [Citation.]" (*People v. Turner* (2004) 34 Cal.4th 406, 419-420.)

Here, the prosecutor's statement was brief and mild and made no reference to Fleming not testifying. Instead, the prosecutor was drawing a parallel between Fleming's demeanor at trial and Fleming's demeanor as witnessed by Bartram on February 14.

These comments cannot be interpreted fairly as referring to Fleming's failure to testify. Nor is it reasonably likely the jury would have understood those remarks as inviting them to infer guilt based on Fleming's failure to testify. No *Griffin* error occurred.

### Fifth Amendment Due Process

Fleming also contends the prosecutor's remarks about demeanor violated his Fifth Amendment due process right to be convicted only by evidence adduced at trial.

California courts generally have held that a prosecutor commits misconduct when he or she comments about a nontestifying defendant's demeanor during the guilt phase of a criminal trial. (See *People v. Medina* (1990) 51 Cal.3d 870, 896 (*Medina*); *People v. Heishman* (1988) 45 Cal.3d 147, 197 [general rule prohibiting comment on nontestifying defendant's courtroom behavior]; *People v. Garcia* (1984) 160 Cal.App.3d 82, 93

14.

(*Garcia*) [prosecutor's improper comment on defendant's "snickering" at witness's testimony].)  The rationale for the rule is:

> "In criminal trials of guilt, prosecutorial references to a nontestifying defendant's demeanor or behavior in the courtroom have been held improper on three grounds:  (1) Demeanor evidence is cognizable and relevant only as it bears on the credibility of a witness.  (2) The prosecutorial comment infringes on the defendant's right not to testify.  (3) *Consideration of the defendant's behavior or demeanor while off the stand violates the rule that criminal conduct cannot be inferred from bad character.*  [Citations.]" (*Heishman,* at p. 197, italics added.)

Fleming argues the prosecutor's reference to his courtroom behavior was improper because it invited the jury to speculate that Fleming's courtroom conduct showed him to be the type of person willing to participate in unlawful activity and therefore was likely to have committed the crime in question.  He also claims the error is of federal constitutional dimension and must be reviewed under the "harmless beyond a reasonable doubt" standard of *Chapman.*  (*Chapman, supra,* 386 U.S. at p. 24.)  But "[c]ourts of this state have generally assumed that prosecutorial misconduct is error of less than constitutional magnitude.  [Citation.]" (*People v. Bolton* (1979) 23 Cal.3d 208, 214, fn. 4.)  Furthermore, in cases where jurors improperly are exposed to certain factual matters, the error usually is tested under the standard set out in *Watson, supra,* 46 Cal.2d at page 836.  (See, e.g., *People v. Tassell* (1984) 36 Cal.3d 77, 89, overruled on other grounds in *People v. Ewoldt* (1994) 7 Cal.4th 380, 386-387; *People v. Cardenas* (1982) 31 Cal.3d 897, 907.)

In *People v. Gilliam* (1974) 41 Cal.App.3d 181, during closing argument, while recounting the robbery victim's trial testimony, the prosecutor observed the defendant was smiling, and stated, "'The defendant thinks it's funny.  Nobody was pointing a gun at him.'"  (*Id.* at p. 194.)  The appellate court concluded this remark did not require reversal of the defendant's conviction after testing the prosecutor's remarks under the standard set out in *Watson.*  (*Gilliam*, at p. 195.)

15.

In *Garcia, supra,* 160 Cal.App.3d 82, the prosecutor, during closing, reviewed the brutal nature of the crimes charged and then asked, "'Why? I can't explain the why of it no more than I can explain why two people could sit in a courtroom and hear [the victim] relate that horrendous experience, how close she came to death and sit here listening to that testimony and snicker and jeer and laugh about it.'" (*Id.* at p. 93.) "A defense objection to this line of argument was overruled, without comment, by the trial court." (*Ibid.*) The court in *Garcia* found the prosecutor's reference to the defendant's courtroom behavior improper, but found the comment brief and did not specifically state the jury could consider the defendant's courtroom conduct as evidence that he committed the crime. The court concluded the *Watson* test of probable prejudice was applicable. (*Garcia,* at p. 95.)

Assuming the prosecutor committed misconduct, we conclude any error was harmless whether viewed under the federal or state standards. (*People v. Huggins* (2006) 38 Cal.4th 175, 208 [any prosecutorial misconduct was harmless under *Chapman, supra,* 386 U.S. at p. 24 and *Watson, supra,* 46 Cal.2d at p. 836].)

The case against Fleming was strong given the significant amount of medical evidence the jury received regarding the cause of B.'s injuries. Kinnison, B.'s primary treating physician, testified at length about the battery of tests and examinations B. underwent to rule out a medical or genetic cause for the findings. It was only after Kinnison ruled out every possible medical explanation or cause of the injuries that he concluded B.'s injuries were caused by nonaccidental head trauma.

Moreover, the trial court instructed the jury on two occasions, both before opening statements and after closing argument, that the jury must consider only evidence that was presented in the courtroom, which consisted of sworn testimony of witnesses and exhibits admitted into evidence. (CALCRIM Nos. 104, 222.) The jury also was instructed that the statements made by the attorneys did not constitute evidence in the case. (*Ibid.*) The jury was told Fleming had an absolute right not to testify, and they were not to consider

16.

his not testifying. (CALCRIM No. 355.) Jurors are presumed to have understood and followed the trial court's instructions. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1005; *People v. Baughman* (2008) 166 Cal.App.4th 1316, 1321.)

Because we conclude the prosecutor's remarks were not prejudicial, we need not address Fleming's further claim that the trial court erred in applying the incorrect standard to his new trial motion.

## II.     Prejudicial Misconduct by Prosecutor

Fleming contends the prosecutor "engaged in a widespread pattern of misconduct, occurring throughout closing argument," violating his constitutional right to due process. Alternatively, Fleming argues that if we determine any of his contentions have been forfeited by the failure of counsel to make specific objections or requests for curative instructions, he has been denied the effective assistance of counsel.

### *Applicable Law and Analysis*

"'Under California law, a prosecutor commits reversible misconduct if he or she makes use of "deceptive or reprehensible methods" when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted. [Citation.] Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights—such as a comment upon the defendant's invocation of the right to remain silent—but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" [Citation.]' [Citation.]" (*People v. Fuiava* (2012) 53 Cal.4th 622, 679.)

"If a prosecutorial misconduct claim is based on the prosecutor's arguments to the jury, we consider how the statement would, or could, have been understood by a reasonable juror in the context of the entire argument. [Citations.]" *People v. Woods* (2006) 146 Cal.App.4th 106, 111.) "No misconduct exists if a juror would have taken the

statement to state or imply nothing harmful.  [Citation.]"  (*Ibid.*)  "'"[A] prosecutor is given wide latitude during argument.  The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom.  [Citations.]  It is also clear that counsel during summation may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature."  [Citation.]'"  (*People v. Ward* (2005) 36 Cal.4th 186, 215.)

"In general, ''"a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant [requested] an assignment of misconduct and [also] requested that the jury be admonished to disregard the impropriety.'"'  [Citation.]"  (*People v. Young* (2005) 34 Cal.4th 1149, 1184-1185.)

The People contend Fleming forfeited some of his argument concerning prosecutorial misconduct by failing to object in the trial court, when objections and admonitions would have cured the alleged harms.  Fleming concedes he did not object to each instance of alleged prosecutorial misconduct raised.  For the sake of judicial efficiency, we will address the merits of Fleming's prosecutorial misconduct contentions.  (*People v. Ochoa* (1998) 19 Cal.4th 353, 427-428.)  By doing so, we determine whether his counsel was ineffective, which he argues in the alternative.  (*People v. Ibarra* (2007) 156 Cal.App.4th 1174, 1179.)

We address each of Fleming's claims of prosecutorial misconduct in turn:[8]

---

[8]    Fleming includes as part of his argument the incident addressed in issue No. 1, *ante*.  Since we have addressed that thoroughly, we do not repeat it here.

18.

## A. Facts Not in Evidence or Vouching

Fleming argues certain statements made by the prosecutor during rebuttal concerning the clear and convincing standard were "an attempt … to bootstrap the jury's reasonable doubt finding onto a prior non-jury finding."

Earlier, during closing argument, defense counsel had contrasted the different burdens of proof in order to illustrate and distinguish proof beyond a reasonable doubt. After discussing the preponderance of evidence standard, defense counsel described the clear and convincing evidence standard as "what [child protective services (CPS)] needs to demonstrate in order to permanently remove the child from your home." Defense counsel then went on to explain the highest burden of proof as being beyond a reasonable doubt.

In rebuttal, the prosecutor noted defense counsel "talked about the different levels of burden. One of them he mentioned was clear and convincing evidence, a burden which you know has already been met --" Defense counsel objected, stating, "Facts not in evidence; improper argument." Before ruling on the objection, the prosecutor continued, stating, "as a result of the testimony that was given." The trial court noted the objection.

Fleming contends the prosecutor's statement "invited the jury to conclude that the evidence that Fleming engaged in child abuse had already been found by CPS to meet the clear and convincing standard. What is suggested, then, is that since another fact finder had already determined the clear and convincing standard was met, it did not take much more to find the case proven beyond a reasonable doubt."

The People counter that, when viewed in full context, the statement is unclear whether the prosecutor was arguing the clear and convincing standard had been met because the jury heard testimony that CPS had been involved in B.'s case, or whether he was arguing that the totality of the evidence presented at trial met the clear and convincing evidence. The prosecutor did state, immediately after the contested

19.

statement, "There's only one other burden that's higher than that, and that's beyond a reasonable doubt.  And that's why you are here, to determine whether, in fact, Mr. Fleming is guilty beyond a reasonable doubt."

The evidence at trial showed that questioning of mother by both the prosecutor and defense counsel elicited responses that B. had been in CPS care.  During direct examination by the prosecutor, mother testified she loved Fleming but broke off her engagement with him because CPS told her she had to choose between Fleming and B., and that if she had contact with Fleming, she would not see B. again.  On cross-examination by defense counsel, mother described her relationship with Fleming as including arguments with each other.  In response from a question by defense counsel, mother acknowledged that tension between the two of them "got worse after [B.] got taken away."

We agree with Fleming that it is misconduct to argue that a defendant had been held to answer after a preliminary hearing or that a grand jury has issued an indictment. (*People v. Whitehead* (1957) 148 Cal.App.2d 701, 706; *People v. Hale* (1947) 82 Cal.App.2d 827, 832-833.)  But we disagree with him that the situation here, when looked at in context, is analogous.

Nor do we agree that what occurred here was impermissible "vouching" by the prosecutor.  (*People v. Anderson* (1990) 52 Cal.3d 453, 479.)  A prosecutor commits misconduct by vouching or suggesting to the jury that he or she possesses factual information or knowledge about the case beyond the evidence adduced at trial.  The impropriety consists in leading the jury to judge the case, not on the basis of the evidence actually presented, but instead on the basis of some other information to which the prosecutor alone is privy and about which the jury remains uninformed.  (*People v. Earp* (1999) 20 Cal.4th 826, 864; see also *People v. Frye* (1998) 18 Cal.4th 894, 971, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

Applying these principles, we conclude the above quoted statements were not improper and do not constitute improper vouching.

### B. Reasonable Doubt Standard

Fleming contends the prosecutor prejudicially misstated the reasonable doubt standard during rebuttal.

During closing, as part of his argument, defense counsel asked the jury that if they found Fleming guilty, would they at some point ask: "Did I convict an innocent father? And if that thought is going to be bugging you and you're going to be having that in your mind, then you vote not guilty."

In countering this argument by defense counsel, the prosecutor, in rebuttal, argued the following:

> "The issue of reasonable doubt, abiding conviction of the truth of the charge, do you believe that [Fleming] is guilty? The answer is yes. Do you believe that you will believe that he is guilty tomorrow, next week, next month? That is proof beyond a reasonable doubt. The question that needs to be asked then first is, do you believe that [Fleming] is guilty? It does not have anything to do with water on a roadway, with snow in the background. That's not relevant to this case.[9] *What is relevant is if* [B.] *was in front of you today, would you say,* [*Fleming*]*, I trust you to take care of* [*B.*]"
> (Italics added.)

Defense counsel objected, stating the prosecutor was misstating the burden of proof. The trial court sustained the objection. The prosecutor continued, stating, "The question is whether you believe that he's guilty. How are you going to determine whether you believe that he's guilty? That's a tough question. What I would suggest it

---

[9] During jury selection, the prosecutor had given an example of circumstantial evidence involving a swimming pool, footprints by the pool, and someone covered in drops of water. Defense counsel, in closing referred to this example and said the current situation was more akin to "a few drops of water by the pool and a footprint and nothing else." Later, he again mentioned the "water" example and asked, "How did that water get there?" and "did it come from snow run-off or was the farmer or rancher across there in the field using the sprinklers or did it rain the night before[?]"

21.

as one way, that you make that determination." The trial court admonished the jury, telling them to "disregard that remark."

Fleming claims the italicized remarks by the prosecutor, and his further comment on that remark, were a prejudicial misstatement of the standard of proof. "It is misconduct for a prosecutor to misstate the law during argument. [Citation.] This is particularly so when misstatement attempts 'to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements. [Citation.]' [Citation.]" (*People v. Otero* (2012) 210 Cal.App.4th 865, 870-871.) "'When, as here, the point focuses on comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' [Citation.]" (*People v. Thomas* (2012) 53 Cal.4th 771, 797.)

Section 1096 defines reasonable doubt as follows: "'It is not a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary doubt. It is that state of the case, which, after the entire comparison and consideration of all the evidence, leaves the minds of jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge.'" No further information about the definition of "reasonable doubt," other than that in section 1096, needs to be given to a jury. (§ 1096a.)

We do not think the prosecutor's argument, when examined in context, misstated the burden of proof. Instead, when considered as a whole, the prosecutor's statements reflect a proper representation of the law. As noted earlier, the prosecutor himself argued, "There's only one other burden that's higher than [clear and convincing], and that's beyond a reasonable doubt. And that's why you are here, to determine whether, in fact, Mr. Fleming is guilty beyond a reasonable doubt."

In any event, even if the prosecutor committed misconduct, we conclude the remarks were harmless. The trial court admonished the jury to disregard the prosecutor's

remark. In addition, the trial court instructed the jury on the reasonable doubt standard of proof. (CALCRIM No. 220.) It also instructed the jury with CALCRIM No. 200, which provides, in part, "If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." We presume the jury obeyed the admonition and the instructions. (*People v. Stanley* (1995) 10 Cal.4th 764, 837.)

### C. Discrediting a Defense Expert

Fleming maintains the prosecutor committed misconduct by referring to facts about Posey not in evidence, namely, that he was the only expert who would challenge shaken baby syndrome.

During direct examination of Posey by defense counsel, Posey acknowledged he was paid to testify. When asked if he always testified on behalf of the defense, Posey stated, "in the last years I have."

During voir dire of Posey by the prosecutor, the prosecutor asked if Posey had ever seen a PowerPoint presentation on forensic science and shaken baby syndrome given by Jane McClellan, who Posey acknowledged had contacted him for consultative services. Defense counsel objected on relevance grounds and the trial court sustained the objection.

During subsequent cross-examination of Posey, the prosecutor displayed a PowerPoint presentation from the federal defender's office that listed Posey as the only expert who "challenges Shaken Baby Syndrome." Posey stated he had not seen the PowerPoint before. The prosecutor then asked Posey whether, "as far as Jane McClellan is concerned, you're the only expert that challenges Shaken Baby Syndrome[?]" Defense counsel objected on grounds the evidence lacked foundation and misstated the evidence. The trial court sustained the objection.

During rebuttal, the prosecutor questioned Posey's bias and described him as someone who "gets paid to come [from Southern California] and testify," and that "in a simple Google search is shown on a PowerPoint presentation to be the only expert that is

23.

listed in a federal defender's presentation as the expert that would challenge Shaken Baby Syndrome." Defense counsel did not object to this statement.

Fleming now claims misconduct by the prosecutor for referring to facts about Posey that were "misleading, misstated the evidence, and referred to matters that were not in evidence."

It is not improper to comment on the possible bias of a witness, if the comment is based on facts placed in evidence or reasonable inferences from information that is factually accurate. (*People v. Farnam* (2002) 28 Cal.4th 107, 171; *People v. Ervin* (2000) 22 Cal.4th 48, 92; *People v. Sandoval* (1992) 4 Cal.4th 155, 179-180.) There was evidence at trial that Posey was hired primarily to testify on the behalf of the defendants, suggesting a possible bias that could be argued to the jury.

Further, it is not misconduct for a prosecutor to "remind the jurors that a paid witness may accordingly be biased .…" (*People v. Arias* (1996) 13 Cal.4th 92, 162.) Thus, our Supreme Court found no misconduct where a prosecutor commented that a defense expert had been paid significant fees to "'come[] up with something that excuses [the defendant's] responsibility.'" (*People v. Cook* (2006) 39 Cal.4th 566, 613.) The court in *Cook* rejected the defense claim that the prosecutor's argument implied that the expert had given "'false testimony for a fee,' thereby impugning defense counsel's integrity for having, in effect, bought the expert's testimony." (*Id.* at pp. 613-614; see also *People v. Spector* (2011) 194 Cal.App.4th 1335, 1407 [no misconduct where prosecutor referred to "paid-to-say" expert witnesses]; *People v. Monterroso* (2004) 34 Cal.4th 743, 783-784 (*Monterroso*) [no misconduct where prosecutor referred to the "industry of these defense experts that bounce around from trial to trial, state to state, collecting good money for testimony"].)

Here, too, the prosecutor's comments about Posey being paid to come from Southern California to testify to give, in essence, a favorable opinion for the defense were "within the bounds of proper argument." (*Monterroso, supra,* 34 Cal.4th at p. 784.)

24.

Although the prosecutor erred in commenting on "a simple Google search" in which Posey was listed as the only expert that would challenge shaken baby syndrome, and in making other references that the trial court had not allowed during cross examination, the error was not prejudicial. Instructions to the jury made it clear the prosecutor's argument was not evidence and that the jury was responsible for evaluating the credibility of the expert witnesses. (See CALCRIM Nos. 222, 332.)

### D. Reference to a Matter Not in Evidence

Fleming argues the prosecutor's reference during rebuttal to the visibility, or lack thereof, of his own bruised eye was a violation of his Fifth Amendment right because it urged the jury to convict Fleming on a matter not in evidence.

During closing argument defense counsel mentioned a possible bruise to B.'s eye, referring to testimony of both the EMT and the emergency room physician who noticed it. Defense counsel urged the jurors to "look at these pictures carefully, and just using your common sense, ask yourself whether that's a bruise or whether that's maybe something else." Defense counsel mentioned Esquivel-Aguilar, who had seen B. two weeks before February 14 and had noticed a pattern, bruise, or discoloration around the left eye. Defense counsel argued the prosecutor wanted the jurors to believe the bruise was caused by Fleming shaking B., but noted the bruise did not change over the course of time, and that, as Posey testified, "bruises don't simply stay the same.… They change."

During rebuttal, in discussing B.'s black eye, the prosecutor argued, "I think that defense counsel counted on you using your common sense as to how long a black eye exists. There's been no evidence of that. I can tell you that during this trial, I had a black eye. You guys probably didn't notice that, and it was cleared up the next day." Defense counsel objected that this constituted improper argument based on facts not in evidence. The trial court sustained the objection. Defense counsel did not request an admonition.

Fleming claims the reference by the prosecutor to his own bruise meant he "effectively testified as a witness by telling the jury he had a black eye that cleared up.

25.

The testimony was significant because the prosecution attributed a small bruise near B.'s eye to the alleged child abuse."

It is misconduct for a prosecutor to state facts not in evidence or to imply the existence of evidence known to the prosecutor but not to the jury. (*People v. Smith* (2003) 30 Cal.4th 581, 617.) Here, the prosecutor's argument was in direct response to defense counsel's argument that the jury should use their common sense in deciding whether the mark seen on B. was a black eye or "something else."

Assuming without deciding that this statement by the prosecutor was misconduct, we conclude there is not a reasonable likelihood the jury construed or applied the complained-of remark in an objectionable fashion. (*People v. Friend* (2009) 47 Cal.4th 1, 29.) The trial court instructed the jury, pursuant to CALCRIM No. 222, that statements by attorneys during closing argument are not evidence. The trial court also admonished the jury, pursuant to CALCRIM No. 200, that it was up to them "alone" to decide what happened, "based only on the evidence that has been presented to you in this trial." Thus, we conclude it is unlikely the jury construed or applied the prosecutor's remarks in an objectionable fashion.

### E. Cumulative Error

Fleming contends finally that the "pattern of misconduct" on the part of the prosecutor denied him a fair trial. We disagree.

We concluded above that the record either does not support a finding the prosecutor committed misconduct, or, if he did, the jury did not apply or construe the prosecutor's statements in an objectionable manner. Accordingly, we reject Fleming's claim that the cumulative impact of the alleged misconduct resulted in prejudice and deprived him of a fair trial and due process. (See *People v. Parson* (2008) 44 Cal.4th 332, 368 [reaching a similar conclusion].)

**III. Mistrial Motion During Voir Dire**

Fleming contends defense counsel was ineffective for failing to request a mistrial after inflammatory comments by a prospective juror during voir dire tainted the final jury panel. He further asserts the trial court violated his federal constitutional rights to due process by failing to declare a mistrial.

### *Summary of Voir Dire Proceedings*

On the first day of jury voir dire, the trial court displayed a list of potential witnesses to the jury and asked the prospective jurors if they knew anyone on the list. Prospective Juror J.S. stated he knew prospective witness Cornell. When asked how, J.S. stated, "I know her brother." Although J.S. had met Cornell, he did not socialize with her on a regular basis; instead, J.S. was a close friend of Cornell's brother. When J.S. then stated Cornell was a "liar," both counsel stipulated to his removal. Defense counsel did not move for a mistrial.

Cornell subsequently testified as a defense witness that she had known Fleming since 2009, and, at some point, Fleming and mother moved in with her, and, later still, into an apartment across the hall from her. According to Cornell, Fleming and mother never screamed, yelled, or used violence, and she described Fleming and mother as very attentive parents to B. Cornell never observed Fleming become violent or frustrated with B. But she did remember one night when B. was having a "temper tantrum" and Fleming came to her place "a little like stressed." And she did recall an incident when Fleming and her husband had had a "heated argument."

### *Applicable Law and Analysis*

A defendant has a constitutional right to a fair and impartial jury. (*People v. Martinez* (1991) 228 Cal.App.3d 1456, 1459 (*Martinez*).) Generally, "discharging the entire venire is a remedy that should be reserved for the most serious occasions of demonstrated bias or prejudice, where interrogation and removal of the offending

venirepersons would be insufficient protection for the defendant." (*Medina, supra,* 51 Cal.3d at p. 889.)

The denial of a motion for a mistrial is reviewed by an abuse of discretion and should be granted "only when '"a party's chances of receiving a fair trial have been irreparably damaged."'" (*People v. Ayala* (2000) 23 Cal.4th 225, 282.) Likewise, the trial court has broad discretion to determine "whether or not possible bias or prejudice against the defendant has contaminated the entire venire to such an extreme that its discharge is required." (*Medina, supra,* 51 Cal.3d at p. 889.) A few inflammatory remarks made by prospective jurors do not automatically necessitate such a drastic remedy.

In *Medina,* a prospective juror on voir dire stated she had heard fellow prospective jurors state that the defendant's own lawyers believed him to be guilty. Another juror stated the "authorities should 'bring the guilty S.O.B. in, we'll give him a trial, and then hang him.'" (*Medina, supra,* 51 Cal.3d at p. 888.) The Supreme Court found the trial court did not err in rejecting a request to discharge the entire jury panel. (*Id.* at p. 889.)

In contrast, in *Mach v. Stewart* (9th Cir. 1998) 137 F.3d 630 (*Mach*), in which the defendant was charged with oral copulation of an eight year old, the trial judge elicited from a prospective juror, who was a social worker with the state's child protective services, that she had a certain amount of expertise in the area of child abuse. The prospective juror also stated that in every case in which one of her clients reported a sexual assault, the assault had been confirmed. The prospective juror stated at least three more times that she was unaware of any case in which a child lied about being sexually assaulted. The prospective juror was excused, but the trial court denied a defense request for a mistrial based on a tainted jury panel. (*Id.* at pp. 631-633.)

The Ninth Circuit Court of Appeals found the defendant's right to an impartial jury had been violated:

28.

"Given the nature of [the prospective juror's] statements, the certainty with which they were delivered, the years of experience that led to them, and the number of times that they were repeated, we presume that at least one juror was tainted and entered into jury deliberations with the conviction that children simply never lie about being sexually abused. This bias violated [the defendant's] right to an impartial jury." (*Mach, supra,* 137 F.3d at p. 633.)

Here, Prospective Juror J.S.'s only statement that Cornell was a "liar" pales in comparison to the statements made in *Medina,* in which no error was found. And unlike the prospective juror in *Mach,* Prospective Juror J.S. expressed no opinion about the specific charged crimes, or that Fleming was guilty of those crimes. In addition, Cornell testified at trial and the jury was able to determine her credibility for themselves.

Fleming argues defense counsel was ineffective for failing to request a mistrial based on jury taint. There are two components to a successful claim of ineffective assistance of counsel. First, a defendant must show the performance of his or her trial counsel was deficient, and, second, that there is a reasonable probability the outcome would have been different had the purportedly deficient acts or omissions not occurred. (*People v. Ledesma* (1987) 43 Cal.3d 171, 217-218 (*Ledesma*).)

With regard to the first prong, a trial counsel's performance is deficient when it falls below an objective standard of reasonableness under prevailing professional norms. (*Ledesma, supra,* 43 Cal.3d at p. 216.) Our scrutiny of that performance is a deferential one. (*Ibid.*) When a claim of ineffective assistance is made on appeal, as here, and the record does not disclose trial counsel's reasons for the challenged act or omission, we will deny the claim unless the record shows either that counsel was asked to explain his or her reasons and failed to do so or that there can be no possible satisfactory explanation. (*People v. Pope* (1979) 23 Cal.3d 412, 426-427, fn. 17, overruled on other grounds in *People v. Berryman* (1993) 6 Cal.4th 1048, 1081, fn. 10, overruled on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.)

29.

"'[I]t [is] a rare case in which the merits of a mistrial motion [are] so clear that counsel's failure to make the motion … amount[s] to ineffective assistance.' [Citation.]" (*People v. Jennings* (1991) 53 Cal.3d 334, 380.) Based on the analysis of *Medina* and *Mach*, we conclude this is not one of those rare cases. Fleming's claim of ineffective assistance of counsel fails. Necessarily, the trial court did not err by failing to declare a mistrial.

## IV. Admission of Fleming's Military Background

Fleming challenges the admissibility of testimony by a former girlfriend about his military experience. Fleming contends the trial court erred in admitting the testimony because it was irrelevant. He also argues admission of this evidence was so prejudicial it violated his right to due process and a fair trial.

### *Procedural Summary*

On the sixth day of trial, the trial court held an Evidence Code section 402 hearing out of the presence of the jury concerning evidence the prosecution wished to offer pursuant to Evidence Code section 1109.[10] At the hearing, Patricia described an instance in 2006 when she was living with Fleming and he followed her through the apartment during an argument, removed the battery from her cell phone, and would not allow her to leave. Fleming grabbed her wrist during the incident. Patricia testified that she was scared because her children were not home, she did not know what was going to happen, and she had no way of communicating with anyone.

When Fleming eventually allowed her to leave, Patricia went to her aunt's apartment next door and called the police. Her aunt received text messages from Fleming

---

**10**    Evidence Code section 1109, subdivision (a)(1) provides that in a case in which the defendant is charged with an act of domestic violence, "evidence of the defendant's commission of other domestic violence is not made inadmissible by [Evidence Code] Section 1101 if the evidence is not inadmissible pursuant to [Evidence Code] Section 352."

stating, "I am two seconds from beating her head in, talk to her before she gets hurt" and "talk to her or I'm going to kill her, no bullshit." When police arrived, they arrested Fleming.

Patricia testified she and Fleming argued constantly and he often had "mood swings out of nowhere." Although she could not recall specific details, Patricia testified about a second incident in which Fleming acted violently toward her.

When the prosecutor asked Patricia about Fleming's military experience, defense counsel objected on relevance grounds. The prosecutor responded that he expected Patricia to testify Fleming had told her he had been in the Army and had killed people, which he argued was relevant to Patricia's perception of Fleming's criminal threat. The trial court overruled the objection.

Patricia then testified Fleming had told her he had been in the Army's infantry, and he wore dog tags, cargo pants, and always carried a Swiss knife. Fleming told Patricia he had killed people, and he had a picture on his computer of two soldiers, one being him standing over a dead body.

On cross-examination, defense counsel impeached Patricia with evidence from the police report that the text messages she described were received on August 17, 2006, but the incident when Fleming locked her in the apartment occurred on August 21, 2006. Patricia also admitted Fleming never directly threatened to kill her, and he never hit or kicked her, although he did throw her onto the mattress during the August 21 incident.

Defense counsel argued Patricia's entire testimony should be excluded under Evidence Code section 352 as improper propensity evidence and because the incident described by Patricia was not sufficiently similar to the incident involving B.

The prosecutor proposed limiting Patricia's testimony to evidence that she and Fleming had a volatile and increasingly violent and aggressive relationship to the point where she obtained a restraining order against him. He also sought to admit Patricia's

31.

belief that Fleming had served in the Army based on the way he dressed and his statement that he had been a soldier and had killed people.

Defense counsel again argued that the probative value of the evidence was substantially outweighed by the risk of undue prejudice. He also argued the evidence regarding Fleming's military background was irrelevant.

Following argument, the trial court ruled the evidence

"goes towards the domestic violence issue of intimidation. There's psychological domestic violence, also, and … I think that's what it goes towards. And I think that while under [Evidence Code section] 352 analysis, I think that it would be fine."

At trial Patricia testified she had a relationship with Fleming in 2006. In August of that year, she and Fleming got into an argument and Fleming followed her through the house and refused to let her leave. Fleming blocked the doors and removed the battery from Patricia's cell phone. When she attempted to use Fleming's cell phone, he grabbed her wrist and threw her onto a mattress. When Fleming eventually calmed down, Patricia left the house and called the police. While they were dating, Fleming wore "Navy dog tags," cargo pants, and carried a Swiss knife and told Patricia he had been in the Army and had killed several people. Fleming subsequently was arrested for making threats toward Patricia. On cross-examination, Patricia acknowledged that Fleming never hit or kicked her.

The prosecutor also introduced evidence of Fleming's military background during the testimony of Cross, who testified Fleming had told him he was kicked out of boot camp because the drill sergeants did not like him.

### *Applicable Law and Analysis*

A trial court's decision to admit or exclude evidence, whether made in limine or following a hearing pursuant to Evidence Code section 402, is reviewed for abuse of discretion. (*People v. Williams* (1997) 16 Cal.4th 153, 196-197.) Abuse will not be found unless the trial court has exceeded the bounds of reason by exercising its discretion

in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

Relevant evidence is all evidence "'including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' (Evid. Code, § 210; [citation].) The court is vested with wide discretion in determining relevance under this standard. [Citation.]" (*People v. Kelly* (1992) 1 Cal.4th 495, 523.) However, "the court has no discretion to admit irrelevant evidence. [Citations.]" (*People v. Poggi* (1988) 45 Cal.3d 306, 323 [where photographs of victim were not relevant to any disputed material issue, trial court had no discretion to admit them].)

With certain exceptions, "in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by [Evidence Code] Section 1101 if the evidence is not inadmissible pursuant to [Evidence Code] Section 352." (Evid. Code, § 1109, subd. (a)(1).) "Under Evidence Code section 1109, evidence of a prior act of domestic violence is admissible to prove the defendant had a propensity to commit domestic violence when the defendant is charged with an offense involving domestic violence." (*People v. Rucker* (2005) 126 Cal.App.4th 1107, 1114 (*Rucker*).) In *People v. Dallas* (2008) 165 Cal.App.4th 940, 942-943, the court held that a prosecution for child abuse pursuant to section 273a, subdivision (a) constitutes a "domestic violence" prosecution as the term is used in Evidence Code section 1109.

The trial court, however, has the discretion to exclude any such evidence under Evidence Code section 352 if it is more prejudicial than probative. (*Rucker, supra,* 126 Cal.App.4th at p. 1114.) "The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence,

33.

the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying [Evidence Code] section 352, "prejudicial" is not synonymous with "damaging."' [Citation.]" (*People v. Karis* (1988) 46 Cal.3d 612, 638.) "[A]s the Supreme Court has repeatedly and recently reaffirmed, 'when ruling on a[n] [Evidence Code] section 352 motion, a trial court need not expressly weigh prejudice against probative value, or even expressly state that it has done so. All that is required is that the record demonstrate the trial court understood and fulfilled its responsibilities under … section 352.' [Citations.]" (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1315.)

Fleming argues the testimony of Patricia that Fleming wore cargo pants, dog tags, carried a Swiss knife, and stated that he had killed someone while serving in the Army was irrelevant. The People argue this evidence helped to explain the basis for Patricia's fear of Fleming during the incident she testified to, in which he followed her through the apartment during an argument, removed the batteries from her cell phone, and blocked her from leaving. Fleming counters that since no threats by Fleming toward Patricia were admitted into evidence, and because Patricia never testified that Fleming's military experience placed her in fear, the basis for admissibility was invalid.

Even if we assume admission of this evidence was error, Fleming has failed to demonstrate a reasonable probability that he would have received a more favorable outcome at trial had the evidence been excluded. (*Watson, supra,* 46 Cal.2d at p. 836.) Patricia's mention of Fleming's claims regarding his military experience was brief and never mentioned during the prosecutor's closing or rebuttal arguments. In addition, the jury's focus in its deliberations appears to have centered on the medical evidence, as demonstrated by the requests for read back of testimony from the first responder and medical doctors.

Fleming also argues that admitting the evidence in question violated his due process rights. "'Ordinarily, even erroneous admission of evidence does not offend due process unless it is so prejudicial as to render the proceeding fundamentally unfair.' … [¶] 'To prove a deprivation of federal due process rights, [a defendant] must satisfy a high constitutional standard to show that the erroneous admission of evidence resulted in an unfair trial.' [Citation.] '"The dispositive issue is … whether the trial court committed an error which rendered the trial 'so "arbitrary and fundamentally unfair" that it violated federal due process.' [Citations.]" [Citation.]' [Citation.]" (*People v. Covarrubias* (2011) 202 Cal.App.4th 1, 20.)

As we explained above, even if the trial court erred in concluding the evidence was relevant, its admission was not unduly prejudicial. Thus, its admission did not violate Fleming's constitutional rights.

## V. Posttrial *Marsden* Motion

Fleming argues the trial court abused its discretion when it denied his posttrial *Marsden* motion because he established trial counsel's incompetence and, therefore, new counsel should have been appointed to file a new trial motion based on trial counsel's incompetence.

### *Procedural Summary*

Following his conviction but before sentencing, Fleming filed a written *Marsden* motion alleging trial counsel had been ineffective and he requested substitution of counsel. At a hearing on the motion, Fleming alleged counsel was ineffective for (1) failing to call Atkinson and Barnes as expert witnesses at trial, (2) failing to impeach Fleming's ex-girlfriend Leanna, (3) failing to provide copies of the medical records, police reports, and other miscellaneous discovery, (4) failing to file a *Pitchess*[11] motion because Cross's report included statements Fleming never made, (5) failing to file a

---

[11] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

section 1538.5 motion, (6) a lack of mental alertness during the last few days of trial, (7) failing to notify the trial court that some jurors appeared to fall asleep during trial, (8) inadequate communication and followup with Fleming, and (9) improper advice to waive his speedy trial rights.

In response, trial counsel first discussed the timing of his appointment as Fleming's counsel and the general efforts he undertook with regard to the pretrial investigation. He then responded to each of Fleming's complaints in turn. He explained he never planned on calling Atkinson as a witness because his testimony would have been cumulative to Posey's testimony. Although counsel explained he "wish[ed]" he would have had Barnes testify, he did not necessarily think it was a mistake on his part because Barnes "does not travel." Counsel stated Barnes "will only testify via telephone or an Internet hook-up. I don't believe that I asked the Court to do either of those things. In retrospect I wish I would have done that." Defense counsel stated he did think there was "some merit to the claim that [Dr. Barnes's] could have been important in this case given the ultimate outcome." But, he explained, the jury heard extensively about Barnes and his findings, his curriculum vitae (CV) was placed into evidence, and Posey and Kinnison testified extensively about various aspects of Barnes's report.

Defense counsel explained he did not impeach Leanna because it would have been a minor issue in "the whole scheme of things," and he did not want to open the door to other, more prejudicial issues that had been raised in the pretrial Evidence Code section 402 hearing. Counsel noted he did impeach Leanna "substantially and extensively on the issue which mattered most to this case," which was the alleged injury she found on her own son.

Defense counsel did not recall Fleming asking him to file either a *Pitchess* or section 1538.5 motion, but such motions would have been meritless given the facts of the case.

36.

Concerning his conduct during trial, defense counsel admitted he was "not as mentally sharp" as he would have liked to be on the first day of trial when he questioned Kinnison, but he had been "a little bit under the weather." He felt he had recovered by the following day and was able to cover every issue he could have raised with respect to Kinnison's testimony.

Defense counsel explained Fleming's concerns regarding his failure to provide copies of discovery, stating that he responded to Fleming's requests and visited him in jail no fewer than nine times prior to the start of trial. In addition, defense counsel explained that many of the requested items were not in a format that counsel could provide to Fleming. The two agreed that, if necessary, and upon Fleming's request, counsel would make efforts to provide that information. Fleming never made a followup request. Counsel also stated his jail visits and communications with Fleming were as lengthy as they needed to be and Fleming was given every opportunity to ask questions.

With respect to the speedy trial issue, defense counsel explained Fleming ultimately agreed to waive time in order to allow Posey the full time necessary to review the case, prepare a report, and testify at trial.

Finally, defense counsel addressed the issue of jurors allegedly sleeping during trial. He recalled Fleming mentioning some jurors were either sleeping or not paying attention during part of the testimony. Counsel told Fleming he would notify the trial court, but did not recall if he had done so. He did remember that it was not an issue after that.

After confirming with Fleming that there were no further complaints that needed to be addressed, the trial court denied the *Marsden* motion, stating:

> "To the extent there are conflicts between the statements made during this hearing, I believe [trial counsel] for the following reasons: I have observed [trial counsel] not only through this trial, but through many other trials. There have been conflicts in … Fleming's statements this morning, which were clarified by [trial counsel]. His explanations to the Court certainly

37.

show the Court that he has adequately represented … Fleming, and therefore I find that [trial counsel] has properly represented … Fleming and will continue to do so."

### *Applicable Law and Analysis*

"When a defendant seeks to discharge his appointed counsel and substitute another attorney, and asserts inadequate representation, the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of the attorney's inadequate performance. [Citation.]" (*People v. Crandell* (1988) 46 Cal.3d 833, 854, disapproved on other grounds in *People v. Crayton* (2002) 28 Cal.4th 346, 364-365.)

"The defendant … cannot rest upon mere failure to get along with or have confidence in counsel." (*People v. Bills* (1995) 38 Cal.App.4th 953, 961.)

As detailed above, nothing in the record suggests the trial court deprived Fleming of the opportunity to speak out regarding his dissatisfaction. And defense counsel responded to each of Fleming's allegations.

On appeal, Fleming agrees that he was provided an opportunity to state his grievances with counsel. But, he still claims the trial court abused its discretion in denying his *Marsden* motion because, at a minimum, counsel was ineffective for failing to subpoena Barnes and to alert the trial court about several sleeping jurors. We disagree.

Defense counsel explained the reasons for not providing Fleming with certain discovery. He claimed his visits and communication with Fleming were adequate. Although he did not recall whether he had mentioned the sleeping jurors to the trial court, he did recall it was not "an issue" after Fleming mentioned it to him. Defense counsel further explained it was Fleming who agreed to waive time for a speedy trial in order to allow Posey the time needed to review the case. And counsel explained he had been "under the weather" on the first day of trial, but recovered. We note the trial trial court also was able to observe the jurors during trial, as well as counsel's performance. In addition, "[t]o the extent there was a credibility question between defendant and counsel

at the hearing, the court was 'entitled to accept counsel's explanation.' [Citation.]" (*People v. Smith* (1993) 6 Cal.4th 684, 696.)

As for Fleming's claims about counsel's failure to file certain motions, impeach Leanna, or call Barnes, a disagreement as to tactics and strategy is not sufficient to require substitution of counsel. (*People v. Steward* (1970) 6 Cal.App.3d 457, 464-465.) And there is "no constitutional right to an attorney who will conduct the defense of the case in accordance with an indigent defendant's whims." (*People v. Nailor* (1966) 240 Cal.App.2d 489, 494.)

In particular, Fleming has failed to establish that trial counsel's failure to subpeona Barnes was objectively unreasonable. (*Strickland v. Washington* (1984) 466 U.S. 668, 690.) Posey, a crucial defense witness, testified regarding the mechanism of B.'s injuries and on the theory that the medical findings occurred as a result of birth trauma. Posey testified Barnes had interpreted B.'s scans and X-rays and then provided this information to Posey for use in reaching his expert conclusion. It was reasonable for defense counsel to conclude Barnes's live testimony was unnecessary and cumulative. Defense counsel bolstered Barnes's findings by admitting Barnes's CV into evidence as a defense exhibit. "Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies. [Citations.]" (*Harrington v. Richter* (2011) ___ U.S. ___ [131 S.Ct. 770, 789].)

When the trial court has conducted an adequate hearing, as it has here, and denied the request for substitute counsel, we review the court's ruling for abuse of discretion. (*People v. Ortiz* (1990) 51 Cal.3d 975, 980, fn. 1.) "'Once a defendant is afforded an opportunity to state his or her reasons for seeking to discharge an appointed attorney, the decision whether or not to grant a motion for substitution of counsel lies within the discretion of the trial judge. The court does not abuse its discretion in denying a *Marsden* motion "'unless the defendant has shown that a failure to replace counsel would substantially impair the defendant's right to assistance of counsel.'" [Citations.]

39.

Substantial impairment of the right to counsel can occur when the appointed counsel is providing inadequate representation or when "the defendant and the attorney have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result [citation]." [Citations.]' [Citation.]" (*People v. Myles* (2012) 53 Cal.4th 1181, 1207.) Here, there is no basis for concluding the trial court abused its discretion in denying Fleming's *Marsden* motion.

## DISPOSITION

The judgment is affirmed.

_____
CORNELL, Acting P.J.

WE CONCUR:


_____
GOMES, J.


_____
POOCHIGIAN, J.